IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

MILLER ENGINEERING AND
RESEARCH CORPORATION,
d/b/a MERC AEROSPACE,
Plaintiff,

v.

COLUMBUS TECHNOLOGIES
AND SERVICES, INC.,
Defendant.

No. 1:26-cv-
**Jury Trial Demanded**

# COMPLAINT

Plaintiff Miller Engineering and Research Corporation, dba MERC Aerospace, ("MERC"), files this Complaint against Defendant Columbus Technologies and Services, Inc. ("Columbus"), for damages arising from breach of contract, fraud, and unfair competition, and alleges as follows:

## INTRODUCTION

1. Defendant Columbus is a NASA prime contractor. Plaintiff MERC subcontracted with Columbus to provide significant electrical and electronic engineering labor at Goddard Space Flight Center, as part of the Electrical Systems Engineering Services IV prime contract ("ESES IV" or "ESES") managed by Columbus.

2. MERC supplied dozens of engineers to Columbus under the subcontract. MERC's engineers performed their work for NASA on ESES IV satisfactorily and without incident.

3. Columbus devised and implemented a scheme to seize the value of MERC's subcontract for itself.

4. First, Columbus misrepresented the economics of the subcontract during initial negotiations—specifically the contract's "wrap rate," a critical measure of employees' cost and

profitability—to induce MERC to enter into the subcontract.

5. Once MERC committed to Columbus as a subcontractor, Columbus intentionally rendered MERC's performance of the subcontract inconvenient, impractical, and unprofitable for MERC. It did so by billing NASA for MERC's employees at lower labor categories (and thus lower rates) than they were qualified for under NASA's labor categories, and at unreasonable, unprofitable wrap rates. Because Columbus billed the government on a cost-plus basis, but MERC billed on a time and materials basis, Columbus underbilling NASA for MERC's work hurt MERC's bottom line, but not Columbus's.

6. When MERC pointed out to Columbus it was underbilling MERC's labor, Columbus dragged its feet for a year and refused to correct its mis-categorization of MERC's labor to NASA, or the employees' wrap rates. Then, once Columbus agreed (likely at NASA's prodding) to adjust some of the affected MERC employees' labor categories upward to more accurately reflect their experience – finally rendering MERC's subcontract profitable after a year of losses—Columbus pretextually terminated MERC's contract. It did so specifically because of MERC's complaints about the labor mis-categorization and losses MERC had sustained on the subcontract.

7. After the pretextual termination, Columbus then hired away substantially all of MERC's workforce that was servicing the ESES IV contract—in violation of both Columbus's own contractual non-solicitation obligations, and the confidentiality obligations of the affected employees.

**PARTIES, JURISDICTION, & VENUE**

8. Plaintiff Miller Engineering and Research Corporation, d/b/a MERC Aerospace ("MERC"), is a corporation organized under the laws of Alabama, with its headquarters and

principal place of business in Pasadena, Maryland.

9. Columbus Technologies and Services, Inc. ("Columbus") is a corporation organized under the laws of Nevada, with its headquarters and principal place of business in El Segundo, California.

10. The damages claimed in this action exceed $75,000.

11. The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

12. Venue lies in this district under 28 U.S.C. § 1391(b)(2).

13. The Court has personal jurisdiction over all defendants pursuant to Md. Code §§ 6-102, 6-103(b), and Fed. R. Civ. P. 4(k). All of the conduct at issue occurred in Maryland, including the execution, partial performance, and breaches of the contact, as well as the fraudulent statements and acts in reliance thereon.

## FACTUAL ALLEGATIONS

### A. The Teaming Agreement and its Non-Solicitation Requirement.

14. On July 29, 2022, MERC and Columbus entered into a Teaming Agreement wherein they agreed to submit a proposal to solicit a contract with NASA's Goddard Space Flight Center, Electrical Systems Engineering Services IV ("ESES IV" or "ESES"). The Teaming Agreement is attached as Exhibit 1.

15. The parties believed it was in their mutual interest to work together to submit a proposal to NASA in response to the agency's Request for Proposal ("RFP"), with the objective being for Columbus to supply services specified in the Statement of Work agreed upon by the parties if NASA awarded Columbus the prime contract ("Contract").

16. The Teaming Agreement specified Columbus was to be the Prime Contractor, and MERC the Subcontractor. The Teaming Agreement set out the expectations and parameters of the relationship between them.

17. Section 4 of the Teaming Agreement states "when the Government [NASA] selects the Prime [Columbus] as the awardee…, the Prime agreed to include as a team member the Subcontractor [MERC] for the scope of work set forth in Attachment A of this Agreement."

18. Teaming Agreement Attachment A specified in pertinent part, "MERC will have a workshare of 30 FTEs [i.e. full-time employees] with a goal of 35."

19. The Teaming Agreement provides the Agreement itself would terminate "as to the solicitation" once a definitive subcontract was executed, "except as it relates to proprietary and confidential information."

20. Thus, the Teaming Agreement expressly contemplated that some of its provisions would survive the execution of a subcontract between Columbus and MERC for the ESES IV work.

21. Teaming Agreement § 17 further provided neither party would solicit or hire employees of the other party, during the term of the Teaming Agreement itself, during the term of the contemplated prime contract and subcontract, and one year thereafter:

> During the term of this Agreement and throughout the period of performance of any resultant prime contract or subcontract, including extensions or modification thereto, and for one (1) year thereafter, the parties agree that neither shall directly or indirectly solicit for employment or otherwise seek to induce to leave the employ of the other party any technical or professional employees of the other assigned to work on the proposal effort or any resulting Prime contract or subcontract, without the prior written agreement of the party whose employee is being considered for employment.

22. Teaming Agreement § 17 thus survived the execution of the subcontract between Columbus and MERC.

23. On April 26, 2023, Columbus and MERC entered a Modification of their Teaming Agreement, a true and correct copy of which is attached as Exhibit 2.

24. The Modification states that "From" when NASA selects Columbus for this ESES

IV contract, Columbus agrees to include MERC as a team member for the scope of work, "To" when NASA selects Columbus, MERC shall be a teammate, and Columbus "will terminate MERC only if the Government terminates Columbus."

### B. Columbus Fraudulently Induces MERC to Agree to the Subcontract, and Immediately Begins Taking MERC's Promised Workshare.

25. Between the award of the prime contract to Columbus on or about January 8, 2025, and the execution of Columbus's subcontract with MERC on March 27, 2025, the parties were negotiating which employees MERC would be responsible for providing to NASA, and at what billing rates.

26. All the employees under discussion were "incumbents"—contract employees working for NASA on projects besides ESES IV, whom NASA wanted to continue and assign to ESES IV once performance of that contract began.

27. Although the Teaming Agreement specified that if Columbus won the ESES IV contract MERC would be assigned the equivalent of 30 full-time employees worth of work, Columbus instead proposed during the negotiation of the subcontract that MERC receive only 19 FTEs.

28. Specifically, on or about March 24, 2025, Columbus directed MERC to offer employment to 19 specified individuals. Columbus further specified the title and NASA's labor categorization for each of them, the direct labor cost (i.e., hourly salary) MERC was to pay each of them, and the hourly rate at which each of them would be billed to NASA.

29. MERC was concerned that Columbus's proposed "wrap rate" (the hourly revenue it would receive for the 19 employees, divided by hourly salary it was paying them) would be inadequate to cover MERC's costs.

30. The wrap rates implied by the March 24 email were similarly inadequate to allow

MERC to earn a profit on the subcontract. MERC would have lost money on 16 of the 19 employees, and on the subcontract as a whole.

31. During spring 2025, MERC and Columbus executives periodically discussed the wrap rate required for cost recovery and profitability of these employees, including in the context of the March 24 email.

32. The next day, March 25, 2025, Columbus sent another email stating it intended to reassign two of the 19 employees from MERC to Columbus itself. These were two of the employees specified in the March 24 email on whom MERC would have earned a profit.

33. The next day, March 26, 2025, Columbus sent an email entitled "Updated Allocation Spreadsheet 3/26". It included a spreadsheet further specifying details about the 19 FTEs allocated to MERC—specifically including, for each employee:

(i) the employee's name,

(ii) start date (all in early April 2025),

(iii) labor category, including whether a change in categorization had been made in response to prior MERC complaints,

(iv) hourly direct labor rate,

(v) cost of fringe benefits,

(vi) direct labor cost including fringe benefits (iv + v),

(vii) MERC's bill rate to Columbus,

(viii) margin (calculated as (vii – vi)), and

(ix) wrap rate (calculated as vii / iv)

34. Critically, the March 26 spreadsheet also stated the 19 employes as a whole would result in a wrap rate of 1.75 for MERC.

35. That assertion was significant, because it assured MERC the subcontract as a whole

would be profitable.

36. That assertion was false, fraudulent, and misleading. The math embedded in the March 26 spreadsheet reveals the 1.75 total wrap rate was calculated as a simple average, affording equal weight to each employee's wrap rate as calculated above.

37. But the profitability of MERC's subcontract, like any contract for labor, depended on a weighted average. The wrap rate received for a higher-paid employee is more significant to the contract's overall profitability than the wrap rate received for a junior, lower-paid one.

38. The 3/26 spreadsheet was superficially consistent with earlier representations by Columbus. As part of contemporaneous phone calls that week, Ajay Handa, CEO of Columbus, orally represented Columbus would ensure the MERC subcontract would work out to an aggregate wrap rate of 1.75. Any reasonable government contractor would have understood these representations to refer to a weighted average, not a simple average, because only the former is commercially meaningful.

39. The wrap rates in the spreadsheet shared on 3/26 were false and fraudulent in another respect: the treatment of an award fee. Unbeknownst to MERC at the time, the column "MERC Bill Rate" in the 3/26 spreadsheet assumed a 5% award fee to MERC. But the government had discretion whether to pay an award fee to Columbus, and if Columbus received an award fee, it had discretion about how much of it, if any, to pay to MERC. Columbus did not disclose to MERC, in writing or in contemporaneous meetings discussing the project finances, that Columbus's modeling of a 1.75 all-in wrap rate for MERC included a discretionary award fee that (i) the government was free to withhold from Columbus and (ii) Columbus was free to withhold from MERC. Rather, the 3/26 spreadsheet was held out by Columbus as constituting the rate at which MERC's labor would be billed to Columbus and reimbursed – not the guaranteed

reimbursement rate plus a highly-discretionary 5% award fee. The "MERC Bill Rate" column should have been titled "MERC Bill Rate Plus 5% Award Fee" (or something similar), or explained to be such, for Columbus's statements to not be misleading.

40. On information and belief, Columbus knew its statements about MERC's wrap rate under the forthcoming subcontract were false and misleading at the time it made them. Alternatively, Columbus was recklessly indifferent to the falsity of its statements.

41. Columbus made these false statements intending that MERC rely on them.

42. Specifically, Columbus's misrepresentations about the 1.75 overall wrap rate (and its omission of the fact that that rate included a 5% discretionary award fee) were specifically intended to, and did, assuage MERC's previously-expressed concerns about the profitability of the subcontract – at least long enough for MERC to sign and become obligated to perform. But as explained in more detail below, Columbus's conduct immediately after the subcontract was signed indicates it never intended to pay MERC a 1.75 wrap rate.

43. On information and belief, Columbus likely computes its internal wrap rates for federal contract labor based on averages weighted by employee compensation, not simple averages that treat all contract employees as equally significant. Similarly, on information and belief, when modelling its own contract revenue and wrap rates internally, Columbus likely does not treat discretionary fee awards as if they are guaranteed.

44. On March 27, 2025, MERC notified Columbus by email that Columbus's proposed billing rates for some of the 19 employees were incorrect, because the employees were qualified for higher-paying labor categories. Columbus did not answer this inquiry before MERC signed the subcontract later that day.

45. At the same time Columbus was (i) misrepresenting the subcontract's wrap rate and

(ii) standing silent about the proper categorization of (and thus reimbursement rate for) the proposed MERC employees' labor, Columbus was also (iii) pressuring MERC to sign a definitive subcontract as soon as possible.

46. On March 27, 2025, Columbus and MERC entered into Subcontract No. ESES-IV-4-25-MERC ("Subcontract"), which is attached as Exhibit 3.

47. In signing the Subcontract, MERC relied on Columbus's oral and written assertions that MERC would receive a 1.75 average wrap rate. MERC's reliance was reasonable.

48. The period of performance under the Subcontract was scheduled to be from April 9, 2025, to April 8, 2030.

49. Problems arose almost immediately after the contract was signed.

50. In late March 2025, MERC extended offers of employment to all of the 19 employees Columbus directed MERC to hire for the Subcontract.

51. On March 31, 2025, MERC emailed Columbus's manager for the ESES IV project to follow up about the requested salary changes noted above, and noted MERC had "LC [labor categorization] issues with 4 [employees] that have wrap rates below 1.45." MERC added that it was "targeting to stay within the aggregate 1.75 [wrap rate] we discussed with Ajay [Handa, Columbus's CEO]."

52. Columbus replied it could not make any changes to the employees' tasking or compensation but could take those employees away from MERC and employ them directly itself.

53. In other words, as soon as the ink was dry on the contract, Columbus was already looking for ways to further cut MERC's workshare on ESES IV and the value of MERC's Subcontract.

54. On approximately April 1, 2025, MERC management notified Columbus that all

19 employees had accepted MERC's employment offers.

55. On April 7, 2025, MERC asked Columbus to provide MERC with requests for proposal for MERC's tasking, so MERC could prepare labor category assignments and task plans. In so doing, MERC would have assigned the 19 employees to appropriate labor categories consistent with the statement of work provided by the government, as directed in Columbus' RFP letter to MERC.

56. Columbus replied "At this point, the RFPs will just be a formality as we have already proposed to the government on MERC's behalf using your approved rates and the anticipated tasks. Once you receive the formal RFPs, all we will need from you is a completed Task Plan (template will be provided – this is essentially a reiteration of the State of Work) and concurrence on the completed CTR that will be provided."

57. From approximately April 10 to 14, 2025, Columbus provided MERC with requests for proposal that included MERC contract personnel and labor category specifications. These were documents that Columbus had already submitted to the government with MERC's name on them.

58. The labor categories assigned by Columbus in the RFPs were inconsistent with a 1.75 wrap rate and were insufficient to cover MERC's costs.

59. In other words, without MERC's knowledge, consent, or prior review, Columbus had (ostensibly on MERC's behalf) already represented to NASA that MERC's employees would perform work for NASA at rates below MERC's all-in cost.

60. MERC promptly raised the issue with Columbus. By June 2025, Columbus's CEO informed MERC the labor categories were "non-negotiable."

61. On or about June 18, 2025, MERC officials met with Columbus officials. MERC offered to work with Columbus and NASA to resolve the disparity in reimbursement rates and

proposed several solutions. Columbus adamantly insisted that MERC not contact NASA, and asserted any direct contact by MERC with NASA would violate the Subcontract.

62. Ajay Handa also insisted Columbus would not authorize MERC to make any personnel changes, but he would permit MERC to release the employees to work for Columbus.

63. Under the ESES IV contract, Columbus bills NASA on a cost-plus basis rather than on a time and materials basis (as MERC's contract with Columbus was structured). Hence, moving the affected employees onto Columbus's payroll would have prevented the employees' work from being unprofitable – but only by depriving MERC of its bargained-for share of the contractual workshare (a workshare Columbus had already reduced from 30 to 19 FTEs).

64. Columbus further stated in this meeting that NASA contracting officers for ESES IV had dictated a change to two of MERC Employee's labor categories. That change would cost MERC an additional loss of $70,000 per year for the contract's duration.

65. Over the first year of the contract's performance, MERC repeatedly complained to Columbus that MERC's labor was being misclassified, and that as a result, MERC was being underpaid and losing money on the Subcontract.

66. In September 2025, Columbus informed MERC that Columbus would consider making changes to the labor categories and reimbursement rates at the end of the first contract year, i.e. in spring 2026.

67. Because of Columbus misclassifying the labor of MERC's employees and the inadequate, misrepresented wrap rates, MERC took a loss on the Subcontract the first year of its performance, from April 2025 to April 2026.

68. On or about March 11, 2026, MERC owner Terri Miller and Human Resources Manager Denise Miller met with Ajay Handa and Mark Fuerst, Columbus's project manager for

ESES IV. MERC hoped this meeting would cause Columbus to remedy the reimbursement rate problem.

69. Instead, Columbus directed MERC to stop requesting any labor category reassignments.

70. MERC complained to the Small Business Administration about its mistreatment by Columbus. On information and belief, SBA inquired with NASA about the situation. NASA then contacted MERC about the situation to set up a meeting between Terri Miller and Cynthia Simmons (Goddard Center Director) and Nipa Shah (Goddard's Director of Procurement) on March 19, 2026. At that meeting the NASA officials said they would look into the issue.

71. On approximately March 26, 2026, Columbus approved MERC's request for eleven MERC employees be reclassified into a higher-paying labor category. Columbus denied similar requests as to four other MERC employees.

72. On information and belief, Columbus corrected the categories for the eleven employees only because NASA instructed it to do so.

73. The corrected labor categories rates did not harm Columbus's bottom line in any way, because Columbus is on a cost-plus contract.

74. The labor categories Columbus refused to correct on March 26, 2026, were staffed on task orders where MERC suffered the largest financial losses.

75. However, the corrected labor categories finally rendered MERC's Subcontract marginally profitable on a going forward basis.

76. Columbus was incensed by MERC standing up for itself and by NASA's acknowledgment that MERC was right. Columbus maintained the Subcontract prohibited MERC from communicating with NASA for any reason, even about Columbus's own errors, misconduct,

and fraud on MERC, all of which Columbus had refused to correct. Columbus maintained that MERC's invocation of its own rights was a breach of the Subcontract and a tortious interference with the prime contract.

77. On June 22, 2026, Columbus purported to terminate the MERC Subcontract, effective six days later, for both cause and for convenience. The cited cause was MERC's complaints to Columbus and to NASA about MERC's labor being misclassified and MERC itself being underpaid.

78. In the one week that followed the ostensible termination of the Subcontract, Columbus successfully solicited and hired thirteen MERC engineering employees to leave MERC and begin working for Columbus.

79. On information and belief, the thirteen former employees (Former Employees) now working for Columbus are performing the same tasks and roles they performed while employed at MERC.

80. Other subcontractors working under Columbus's direction on the ESES IV – ADNET Systems, Inc, Newton, LLC, and Relative Dynamics – hired 4 MERC employees. On information and belief, those subcontractors solicited and hired MERC's employees at Columbus's instruction.

81. As shown below, Columbus's solicitation and hiring (and arranging for or directing third party subcontractors to solicit and hire) MERC employees violate both Columbus's and the employees' contractual obligations.

### C. Columbus's Ostensible Termination of the Subcontract, Breach of the Non-Solicitation Agreement, & Interference with the Former Employees' Confidentiality Agreements.

82. In its June 22, 2026, termination notice, Columbus directed MERC to cease all work and invoicing on the project as of June 28, 2026.

83. Since June 22, 2026, Columbus and third parties directed by Columbus have solicited MERC employees to leave MERC, and to join Columbus and its third-party associates.

84. Columbus's intentional poaching of MERC's employees causes MERC financial harm, as part of Columbus's scheme to seize for itself the economic value of MERC's Subcontract.

85. Columbus's methods of solicitation have included "off-boarding" all of MERC's employees from NASA work sites, shutting off their access to Subcontract worksites (unless they leave MERC and join Columbus), cancelling their credentials (again, unless they leave MERC and join Columbus), and directing MERC employees to leave the company before Monday, June 28, 2026, or risk being blackballed and losing future NASA employment opportunities.

86. MERC employees remaining on-site at NASA report their former co-workers have new NASA badges and appear to be doing the same work as before—except for Columbus instead of MERC.

87. Since June 22, 2026, Columbus has continued to solicit active MERC employees via email and phone to work for Columbus, while claiming MERC is terminated from the Subcontract.

88. At Columbus's direction, third parties and federal government employees have solicited MERC employees to induce them to leave MERC while continuing to work on ESES IV. Those efforts have included both promises (asking them to leave MERC for higher wages) and threats (threatening them with inability to obtain employment at NASA in the future).

**D. The MERC Employee Confidentiality Agreements.**

89. As part of their onboarding, MERC employees signed confidentiality agreements.

90. MERC's standard form confidentiality agreement provided as follows:

> The Employee understands and acknowledges that during the course of engagement by MERC, the Employee will have access to and learn about Confidential Information, as defined below:
>
> "*Confidential Information*" means any and all information relating to any aspect of the business and operations of MERC, and/or NASA, which is not known or generally available from sources outside MERC, or typical of industry practice, including without limitation, business processes, practices, methods, plans, documents, operations, services, strategies, contracts, transactions, techniques, negotiations, trade secrets, intellectual property, applications, operating systems, work-in-process, vendor information, financial information, accounting information, legal information, marketing information, pricing information, design information, employee lists, supplier lists, vendor lists, sales information, revenue, costs, designs, original works of authorship, customer information, customer lists, distributor lists and specifications regarding MERC's Business or products, regardless of whether marked as confidential, except to the extent that such information (i) becomes generally available to the public or (ii) is required by law, governmental order or decree to be disclosed by the Employee. The Employee acknowledges that MERC's Confidential Information derives independent economic value from its continued confidentiality, and may also be subject to security clearance restrictions, and for that reason MERC takes reasonable steps, including through the use of this Agreement, to protect its Confidential Information.
>
> *Disclosure and Use Restrictions*. The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever outside of the direct employ of MERC except as required in the performance of the Employee's authorized responsibilities to MERC or with the prior consent of MERC's owner; and (iii) not to possess, access, or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of MERC, except as required in the performance of the Employee's authorized responsibilities to MERC
>
> …
>
> The Employee understands and acknowledges that the Employee's obligations under this Agreement shall continue during and after the Employee's employment by the Employer until such time as such Confidential Information has become

> public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

91. In short, the confidentiality provision provides that any information a signatory (i) learns about MERC business, NASA business, or the Subcontract, (ii) while working at MERC, and which (iii) is not public domain information or "typical of industry practice," is confidential indefinitely, i.e. until it becomes widely known.

92. The Former Employees promised not only that they will not "disclose" confidential information to third parties without MERC's consent, but that they will not "use" it either.

93. The chart below summarizes each of the Former Employees' roles at MERC, the date they signed their confidentiality agreement containing the above-quoted provision, and where they are now working:

| **Employee** | **MERC Role** | **Confidentiality Agreement Signed…** | **Now Working For** |
|---|---|---|---|
| Dennis Krus | Chief Staff Engineer II | 4/3/2025 | Columbus |
| Alexander Teverovsky | Chief Staff Engineer II | 4/8/2025 | Columbus |
| Dylan Lang | Electrical-Electronics Designer III | 5/13/2025 | Newton, LLC |
| Wansik Yoon | Chief Staff Engineer I | 4/2/2025 | Columbus |
| Norman Siddiqi | Chief Staff Engineer II | 4/4/2025 | Columbus |
| Thomas Devlin | Software Engineer (Senior) I | 4/3/2025 | Columbus |
| Eric Galloway | Staff Engineer (Senior III) | 4/2/2025 | Columbus |
| Steven Vincent | Staff Engineer (Senior III) | 4/9/2025 | Columbus |
| Aleksey Vasilyev | Staff Engineer (Senior III) | 4/9/2025 | Columbus |

| | | | |
|---|---|---|---|
| Gavin Baird | Software Engineer (Senior) I | 4/7/2025 | Columbus |
| Kehinde Oladapo | Systems Engineer (Senior III) | 4/3/2025 | Columbus |
| Jay Brusse | Chief Staff Engineer II | 4/2/2025 | Columbus |
| Robert Kalogerakos | Electrical Sys Eng Sr | 4/3/2025 | ADNET Systems, Inc |
| Vilem Mikula | Detector/Instrument Engineer | 4/9/2025 | ADNET Systems, Inc |
| Xiaozhen Xu | Systems Engineer (Senior III) | 4/9/2025 | Relative Dynamics |
| Gang Ron Hu | Senior Detector/Instrument Engineer | 4/4/2025 | Columbus |
| Deepak Sapkota | Detector/Instrument Engineer | 4/9/2025 | Columbus |

94. Each Former Employee's confidentiality agreement is a valid and enforceable contract.

95. Columbus knew each of the Former Employees listed above – Krus, Teverovsky, Lang, Yoon, Siddiqi, Devlin, Galloway, Vincent, Vasilev, Baird, Oladapo, Brusse, Kalogerakos, Mikula, Xu, Hu, and Sapkota – have enforceable confidentiality agreements with MERC.

96. On information and belief, those former MERC employees working for third party subcontractors are performing the same tasks and roles they were performing while employed at MERC, for the same NASA project.

97. Because the Former Employees are working on the same engineering projects as Columbus employees (or, in a few cases, as employees of other third-party ESES IV subcontractors working at Columbus's direction) as they were when MERC employees, they are inevitably disclosing confidential information (as contractually defined) to others at Columbus or the third-party subcontractors. It is further inevitable they are using such confidential information in the course of their jobs. They could not do their jobs in aid of the ESES IV contract without

using and disclosing MERC's confidential information.

98. Thus, the Former Employees are breaching their confidentiality agreements by performing the same NASA work for Columbus and third-party subcontractors working on ESES IV that they performed for MERC.

99. By staffing the Former Employees on the ESES IV project, Columbus is intentionally inducing the Former Employees to breach their confidentiality agreements, thereby tortiously interfering with those contracts.

100. In addition, by soliciting and hiring the Former Employees it now employs, Columbus breached § 17 of the Teaming Agreement, as quoted at ¶ 21, *supra*.

101. MERC has not consented to the Former Employees disclosing confidential information to Columbus or others and has not consented to the Former Employees using the confidential information for anyone else's benefit.

102. Columbus was made aware of the Former Employees' confidentiality agreements in March and April 2026, and contemporaneously with Columbus's solicitation and hiring of them. Columbus hired them anyway and continues to employ them to this day.

103. By hiring the Former Employees and staffing them on the same NASA project they were working on while employed at MERC, Columbus is knowingly and intentionally breaching its own non-solicitation agreement with MERC and is tortiously interfering with the confidentiality agreements between MERC and the Former Employees.

**E. Columbus's Conduct Harms MERC.**

104. Columbus fraudulently induced MERC into the Subcontract and intentionally miscategorized and underpaid MERC's skilled engineering labor, causing MERC to suffer a year of losses.

105. Columbus's wrongful termination of MERC's Subcontract after MERC obtained relief from the mis-categorization of its labor continues to harm MERC financially. MERC's labor subcontract runs into 2030 and is worth over $21 million of revenue over its remaining life—and that's assuming MERC received only the 19 FTEs Columbus allotted it, and at the lower approved labor categories and rates. The contract is worth $44.8 million in revenue if MERC received all 30 FTEs at the "highest and best" labor categories (that, is billing all 19 actual MERC employees at the highest rates they were qualified for and extending their average to 30 FTEs). MERC could reasonably expect to earn over $10.1 million in profit over the life of the contract if its employees were reimbursed at their "highest and best" use, and if it earned a 4.9% award fee.

106. Absent the revenue from the Former Employees and the ESES IV subcontract, MERC is in peril of going out of business.

107. Columbus's wrongful termination of MERC's subcontract and Columbus's wrongful poaching of MERC's employees—in violation of Columbus's own non-solicitation agreement and the employees' confidentiality agreements—also harms MERC's ability to obtain future government contracts. The government considers whether potential contractors have a track record of successful past performance; premature termination will count against MERC. If MERC cannot satisfactorily perform this Subcontract, it is less likely to obtain future federal contract work.

108. As a direct result of the Former Employees' departures, MERC has been unable to fulfill at least five client contracts or service commitments MERC is presently supporting.

109. MERC is able to be awarded highly technical contracts and scope of work only if MERC has the team and staff necessary not only to win proposals, but also to perform the specific work and services requested of MERC.

110. MERC has incurred substantial costs from the sudden loss of experienced employees, which also prevents MERC from fulfilling performance on other future subcontracts that MERC has been awarded or is set to be awarded soon.

111. MERC and its subsidiary, Research Support Instruments Inc., were recently awarded contracts with the Missile Defense Agency for the Scalable Homeland Innovative Enterprise Layered Defense ("SHIELD") program, Solicitation No. HQ085925RE001. MERC will be unable to respond to Requests for Proposal and receive task awards without the Former Employees' support.

112. MERC recently submitted a proposal to the Department of War for Research Engineering and Mission Integration Services 2 ("REMIS-2"), Solicitation No. FA880926RB003, for the Space Test Program. MERC cannot perform task awards without the Former Employees' support. MERC needs the past and continued performance on the ESES IV contract in order to bid and provide the resources to perform this work. This award is anticipated within the next few months.

113. MERC plans to submit a contract proposal to NASA GSFC for Environmental Test and Integration Services ("ETIS") IV, Solicitation No. 80GSFC24R0012, which requires the Former Employees' skills, institutional knowledge, and capabilities. Without these employees, MERC's ability to negotiate a significant workshare and develop a technical proposal solution with a prime contractor is severely limited.

114. MERC planned to submit a contract proposal to the United States General Services Administration for OASIS+, Solicitation No. 47QRCA23R0006P2, which requires the Former Employees' skills, institutional knowledge, and capabilities. Without the Former Employees, MERC will not be able to qualify for this contract, which has required thresholds for numbers of

employees and financial performance. MERC needs the past performance of the ESES IV contract, including the 30 full-time employees MERC was contractually entitled to have perform tasks on the ESES IV contract from Columbus. Without this, MERC will not even qualify to bid on this contract as it had previously planned.

115. MERC is working on a contract with a commercial customer that requires significant unique skills possessed by at least five of the Former Employees. MERC's performance is severely degraded without access to their support. MERC needs the past performance of the ESES IV contract and its employees in order to fulfill and perform the full scope of work required for this contract.

116. Numerous departing employees have informed MERC that Columbus is disparaging MERC to NASA. If the current pattern continues, MERC faces the prospect of being unable to continue operations due to insufficient staffing, loss of clients, and the inability to perform its past and future work.

117. MERC must have certain types of security clearances to be awarded government contracts. These clearances require MERC to disclose whether it has ever been terminated from a government contract. Having to disclose Columbus's unlawful termination to the government severally limits MERC's ability to obtain those clearances and risks its ability to obtain future business.

## COUNT I

## BREACH OF CONTRACT - NONSOLICITATION

118. MERC realleges all prior allegations.

119. The Teaming Agreement is a valid and enforceable contract between Columbus and MERC.

120. The Teaming Agreement's non-solicitation provision survived the subsequent execution of the subcontract between Columbus and MERC.

121. Columbus breached the non-solicitation provision by soliciting and hiring the Former Employees, with each such act of solicitation and each such hire constituting a separate breach.

122. Columbus's breaches were without justification.

123. Columbus's breaches have caused monetary damages to MERC.

124. Columbus's breaches have caused irreparable injury to MERC that cannot be compensated by money damages alone, and for which MERC is entitled to injunctive relief.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACT – EMPLOYEE CONFIDENTIALITY AGREEMENTS

125. MERC realleges all prior allegations.

126. The confidentiality agreements between MERC and the Former Employees are valid and enforceable contracts.

127. Columbus is a stranger to those confidentiality agreements.

128. At the time it hired the Former Employees, Columbus knew the Former Employees were subject to restrictive covenants. MERC notified Columbus several times before Columbus hired the Former Employees that those employees are subject to enforceable restrictive covenants specifically pertaining to this project with Columbus.

129. Columbus willfully and wantonly ignored those notices and asserted it will continue to control for whom MERC's employees work, and that Columbus has no obligation to cease soliciting and poaching MERC's employees.

130. The Former Employees breached their confidentiality agreements with MERC by

agreeing to work on the ESES IV project for Columbus and other third-party ESES IV subcontractors.

131. Despite knowing of the Former Employees' confidentiality agreements with MERC, Columbus intentionally induced them to breach their confidentiality agreements by recruiting and hiring them to work on the ESES IV project.

132. Columbus's conduct was wrongful because it intentionally induced the Former Employees to breach their contracts.

133. Columbus's conduct was also wrongful because it has employed coercive methods to induce the Former Employees to work for Columbus and third-party subcontractors on ESES IV, which work inevitably breaches the Former Employees' confidentiality agreements. Specifically, Columbus has threatened engineers who did not leave MERC and come to work for Columbus or third-party subcontractors on the ESES IV project that they will be blackballed from current and/or future NASA work.

134. Columbus's tortious interference with MERC's confidentiality agreements with the Former Employees was not justified by fair competition or any other valid business purpose.

135. Columbus's conduct was without justifiable cause, was calculated to damage MERC in its lawful business, and exceeded the bounds of lawful competition.

136. Columbus's conduct constitutes tortious interference with contract.

137. Columbus's conduct has caused MERC to suffer monetary damages.

138. Columbus's conduct was the direct and proximate cause of the Former Employee's breaches, and of MERC's damages.

139. Columbus's conduct has caused MERC to suffer harm that cannot be remedied by money damages alone, and for which MERC is entitled to injunctive relief.

**COUNT III**

**COMMON LAW UNFAIR COMPETITION**

140. MERC realleges all prior allegations.

141. Maryland recognizes a freestanding unfair-competition tort defined broadly as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943).

142. As set forth above, Columbus has damaged MERC's business by unfair methods:

a. Columbus intentionally manufactured MERC's unprofitability on the parties' subcontract, then pretextually terminated MERC when MERC complained and obtained a measure of relief and then seized MERC's workshare for itself.

b. Columbus induced MERC's former employees to breach their confidentiality agreements with MERC.

c. Columbus threatened to blackball MERC's former employees from current and/or future NASA work if they did not come to work for Columbus on the ESES IV project (work which would inevitably involve them breaching their confidentiality agreements).

143. Columbus's conduct has caused MERC to suffer monetary damages.

**COUNT IV**

**BREACH OF CONTRACT – SCOPE OF WORK**

144. MERC was contractually entitled to staff 30 employees to work on the Subcontract, and Columbus was contractually obligated to allocate 30 FTEs of work to MERC.

145. Alternatively, Columbus was obligated to make good faith efforts to allocate as close to 30 FTEs to MERC as circumstances permitted.

146. At most, MERC had 19 employees working with Columbus on the Subcontract.

147. Columbus persistently staffed fewer than 30 employees on the Subcontract.

148. Columbus provided no rationale justifying its failure to fulfill this employment obligation.

149. In fact, as MERC has performed the Subcontract, Columbus has removed tasks and MERC's employees from the work on the Subcontract.

150. On information and belief, despite Columbus breaching this obligation to MERC, Columbus has hired and administered up to $21 million dollars from other subcontractors to provide the same or similar services that it was contractually obligated to provide to MERC. In other words, rather than providing the contractually required workshare to MERC, Columbus allocated tens of millions of dollars of labor to other firms – including directed subcontracting firms that (unlike MERC) were not part of the initial bid but were brought on later.

151. In addition, all agreements between the parties include an implied duty of good faith and fair dealing requiring each party not to frustrate the other party's ability to obtain the full benefits of contractual performance. Columbus's conduct breached that duty.

152. Columbus's conduct has caused MERC to suffer monetary damages.

## COUNT V

## FRAUDULENT INDUCEMENT

153. MERC realleges all prior allegations.

154. In the course of negotiating the subcontract, Columbus represented MERC would be reimbursed for its employees' labor at a 1.75 wrap rate.

155. Columbus made those representations orally and in writing on March 26 and 27, 2025 (the date the subcontract was signed), and during the days and weeks prior.

156. When it entered into the subcontract, MERC relied on Columbus's representations about the wrap rate, with MERC hiring and staffing employees to perform the ESES IV work.

157. MERC's reliance on Columbus's representations was reasonable.

158. On information and belief, Columbus's agents knew their representations were false when they made them.

159. Alternatively, on information and belief, Columbus's agents were recklessly indifferent to the truth of their representations when they made them.

160. Columbus knew MERC would be hiring employees and taking other actions in reliance on Columbus's representations about reimbursement and wrap rates. Columbus made the misrepresentations about intended reimbursement rates to induce MERC to rely on them.

161. MERC relied on Columbus's misrepresentations by entering into the subcontract, hiring the employees Columbus specified, and staffing them on the ESES IV work.

162. MERC was actually deceived and suffered damages when it acted in reliance on Columbus's misrepresentations.

163. Columbus acted out of actual malice. It acted fraudulently and specifically intended to injure MERC in its business.

164. Columbus's conduct has caused MERC to suffer monetary damages.

165. MERC is entitled to punitive damages.

**<u>COUNT VI</u>**

**<u>BREACH OF CONTRACT – UNLAWFUL TERMINATION</u>**

166. MERC realleges all prior allegations.

167. Columbus had no cause to terminate the subcontract.

168. The subcontract did not create a right of termination for convenience.

169. Accordingly, Columbus's termination of MERC breached the contract's express terms.

170. Alternatively, if the subcontract permitted termination for convenience, any right to terminate is nonetheless limited by the implied covenant of good faith and fair dealing.

171. As explained above, Columbus manufactured a scheme to deprive MERC of the fruits of its contractual performance. Columbus intentionally manufactured MERC's unprofitability by improperly billing NASA, and once discovered, opposed MERC's efforts to correct Columbus's misdeeds. Columbus used MERC's insistence on its contractual rights as a pretext to terminate the contract.

172. When MERC finally obtained relief by SBA's intervention, Columbus threatened MERC with termination, at precisely the moment the subcontract finally became profitable for MERC.

173. Columbus then terminated MERC and poached its employees, all to seize the economic value of MERC's subcontract for itself.

174. In so doing, Columbus breached the express terms of the contract, or alternatively, violated the implied covenant of good faith and fair dealing.

175. MERC was proximately harmed by Columbus's breach.

176. Columbus's conduct has caused MERC to suffer monetary damages.

## **PRAYER FOR RELIEF**

177. WHEREFORE, MERC respectfully requests the Court enter judgment in MERC's favor and against Columbus, and grant the following relief:

178. Issue a preliminary injunction forbidding Columbus, its employees and agents, and anyone else acting in concert with Columbus or at its direction from:

(i) soliciting, before April 8, 2031, any other MERC employees staffed on the ESES IV contract to leave MERC's employment for Columbus or another third party directed by Columbus;

(ii) continuing to employ the Former Employees (or any other MERC employees that MERC staffed on the ESES IV project) which Columbus solicited; or alternatively,

(iii) staffing the Former Employees on NASA work (or alternatively on NASA's ESES IV project), even if they are permitted to remain employed by Columbus.

179. Issue a permanent injunction against that same conduct as specified above.

180. Compensatory damages in an amount to be determined at trial, but at least $10.5 million.

181. Consequential and special damages for business reputational harm, loss of past-performance citations needed to win future work as a federal subcontractor, and inability to bid on and win existing and future contracts including the MDA SHIELD contract, DOW REMIS-2 contract, NASA ETIS IV contract, AFRL Enterprise Solution contract, GSA OASIS+ contract, and commercial customer contracts, and all other damages flowing from Columbus's conduct, in an amount to be determined at trial.

182. Order specific performance of the contract between Columbus and MERC, requiring Columbus to perform all obligations under the terms of the contract as originally agreed;

183. Award MERC pre- and post-judgment interest as provided by law;

184. Award MERC punitive damages;

185. Award MERC the costs, fees, and such other relief as the Court deems appropriate.

186. MERC demands a jury trial on all issues so triable.

Dated: September 3, 2026

Respectfully Submitted,

/s/ Caitlin P. Contestable
Caitlin P. Contestable
Bar No. 18826
Chalmers, Adams, Backer,
& Wallen, PLLC
204 North Person Street
Raleigh, NC 27601
ccontestable@chalmersadams.com
(727) 644-2957
*Attorney for Plaintiff*

/s/ Jonathan R. Marx
Jonathan Marx
NC Bar No. 35428
204 N. Person St
Raleigh, NC 27601
jmarx@chalmersadams.com
919 701.0125
*Pro Hac Vice Application Pending*

/s/ Christopher Stock
Christopher Stock
NC Bar No. 61125
Chalmers, Adams, Backer,
& Wallen, PLLC
6739 Falls of Neuse Road
Raleigh, NC 27615
cstock@chalmersadams.com
(919) 623-6482
*Pro Hac Vice Application Pending*

/s/ Trey Mayfield
Earl N. "Trey" Mayfield, III
Virginia State Bar No. 41691
Chalmers, Adams, Backer,
& Wallen, PLLC
1032 15th St. NW, #374
Washington, DC 20005
tmayfield@chalmersadams.com
(678) 582-8900
*District Bar Application Pending*