**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MILLER ENGINEERING AND RESEARCH CORPORATION,** | * | |
| **Plaintiff,** | * | **Civil Case No.: SAG-26-03501** |
| **v.** | * | |
| **COLUMBUS TECHNOLOGIES AND SERVICES, INC.,** | * | |
| **Defendant.** | * | |

* * * * * * * * * *

**MEMORANDUM OPINION**

Plaintiff Miller Engineering and Research Corporation, d/b/a MERC Aerospace ("MERC") asserts claims against Defendant Columbus Technologies and Services, Inc. ("Columbus") for damages arising from alleged breach of contract, fraud, and unfair competition. ECF 1. MERC has filed a Motion for Temporary Restraining Order and Preliminary Injunction. ECF 10. Columbus opposes the motion, ECF 15, and MERC filed a reply, ECF 17. This Court has reviewed the filings and held a hearing on the motion on October 26, 2026. ECF 20. For the reasons explained below, the motion will be denied.

## I. BACKGROUND

***The Teaming Agreement***

Plaintiff MERC and Defendant Columbus are government contractors who provide "electrical and electronic engineering labor." ECF 1 ¶ 1. Together, they executed a Teaming Agreement on July 29, 2022, for the purpose of bidding on a future NASA project: the Goddard Space Flight Center, Electrical Systems Engineering Services IV (the "ESES Project"). *Id.* ¶ 14; *see* ECF 1-1. In the Teaming Agreement, Columbus was to be the Prime Contractor and MERC the Subcontractor, if NASA awarded Columbus the contract. ECF 1 ¶¶ 15–16.

Attachment A to the Teaming Agreement set out MERC's anticipated workshare. ECF 1-1 at 11. The Teaming Agreement also contained a non-solicitation provision:

> During the term of this Agreement and throughout the period of performance of any resultant prime contract or subcontract, including extensions or modification thereto, and for (1) year thereafter, the parties agree that neither shall directly or indirectly solicit for employment or otherwise seek to induce to leave the employ of the other party any technical or professional employees of the other assigned to work on the proposal effort or any resulting Prime contract or Subcontract, without the prior written agreement of the party whose employee is being considered for employment.

*Id.* at 9. "Except as it relates to proprietary or confidential information," the Teaming Agreement was set to "terminate" upon a list of events occurring, most relevant here, the "[e]xecution of a subcontract as contemplated in this Agreement." *Id.* at 3–4.

***The Subcontract***

NASA awarded the prime contract for the ESES Project to Columbus on or about January 8, 2025, and the parties began negotiating the subcontract. ECF 1 ¶ 25. Despite the Teaming Agreement estimating that MERC would supply 30 employees under the contract, on or about March 24, 2025, ECF 1-1 at 11, Columbus directed MERC via email to offer employment to 19 specified individuals. ECF 1 ¶ 28. MERC "was concerned that Columbus's proposed 'wrap rate' (the hourly revenue it would receive for the 19 employees, divided by hourly salary it was paying them) would be inadequate to cover MERC's costs." *Id.* ¶ 29.

The parties disputed the proposed billing and wrap rates for the 19 employees during the negotiations period, *id.* ¶¶ 33–34, 44, but nonetheless entered into Subcontract No. ESES-IV-4-25-MERC (the "Subcontract") on March 27, 2025. *Id.* ¶ 46; ECF 1-3. The Subcontract was set for the term of April 9, 2025, through April 8, 2030. ECF 1-3 at 1. It states that it constitutes the "entire agreement" between the parties for the ESES Program, and it "supersedes and replaces all previous understandings, commitments, or agreements, oral or written, … executed by both parties." *Id.* In the Subcontract, Columbus promises to "work towards the agreed to workshare in the Teaming Agreement." *Id.*

***Performance of the Subcontract***

In late March, 2025, MERC extended offers of employment to all of the 19 employees Columbus directed it to hire under the Subcontract. ECF 1 ¶ 50. All of the employees signed restrictive covenant agreements with MERC (the "Employment Agreements"), which included non-solicitation, non-competition, and confidentiality agreements. *Id.* ¶ 89; *see* ECF 10-6. Columbus was made aware of the Employment Agreements in March and April of 2026. ECF 1 ¶ 102.

On March 31, 2025, MERC emailed Columbus to follow up regarding MERC's concerns that certain employees' billing rates were incorrect and that MERC would be losing money under the Subcontract. *Id.* ¶ 51. Columbus replied that it could not make any changes to the employees' tasking or compensation. *Id.* ¶ 52. In April, 2025, Columbus provided MERC with contract personnel and labor category specifications that Columbus had already submitted to NASA. *Id.* ¶ 57. MERC promptly notified Columbus that the labor categories assigned by Columbus in the documents "were inconsistent with a 1.75 wrap rate and were insufficient to cover MERC's costs." *Id.* ¶ 58, 60.

In June, 2025, MERC and Columbus met to discuss the disparity in reimbursement rates. *Id.* ¶¶ 60–61. Columbus informed MERC that the labor categories were "non-negotiable" and that MERC could not make any personnel changes but could release the employees to work for Columbus. *Id.* ¶¶ 61–62. Columbus further informed MERC in this meeting that "NASA contracting officers for ESES IV had dictated a change to two of MERC Employee's labor categories," which would cost MERC an "additional loss of $70,000 per year for the contract's duration." *Id.* ¶ 64.

In the first year of the contract's performance, MERC "repeatedly complained" to Columbus that MERC's labor was being misclassified, which was resulting in MERC being underpaid and losing money on the Subcontract. *Id.* ¶ 65. As a result, in September, 2025,

Columbus informed MERC that it would consider making changes to the labor categories and reimbursement rates at the end of the first contract year. *Id.* ¶ 66. In March, 2026, MERC and Columbus again met to discuss the reimbursement rate, and Columbus directed MERC "to stop requesting any labor category reassignments." *Id.* ¶ 69. MERC then complained to the Small Business Administration about Columbus's actions, and "on information and belief," the Small Business Administration inquired with NASA about the situation. *Id.* ¶ 70. NASA then contacted MERC and arranged a meeting with them on March 19, 2026. *Id.* On approximately March 26, 2026, Columbus approved MERC's request for eleven of MERC's employees to be reclassified "because NASA instructed it to do so." *Id.* ¶¶ 71–72.

***Termination of the Subcontract***

Because Columbus "maintained [that] the Subcontract prohibited MERC from communicating with NASA for any reason," Columbus asserted that "MERC's invocation of its own rights was a breach of the Subcontract and a tortious interference with the prime contract." *Id.* ¶ 76. On June 22, 2026, Columbus purported to terminate the Subcontract, effective six days later, "for both cause and convenience." *Id.* ¶ 77. Columbus's cited cause was MERC's "complaints to Columbus and to NASA." *Id.*

In the week following termination of the Subcontract, Columbus "solicited and hired thirteen MERC engineering employees to leave MERC and begin working for Columbus." *Id.* ¶ 78. "On information and belief," those same thirteen employees are performing for Columbus the same tasks and roles they performed while employed by MERC. *Id.* ¶ 79. Other subcontractors working under Columbus's direction on the ESES Project—ADNET Systems, Inc; Newton, LLC; and Relative Dynamics—also hired four of MERC's employees. *Id.* ¶ 80. Because the former employees of MERC "are working on the same engineering projects" as when they were employees of MERC, MERC believes that "they are inevitably disclosing confidential information" and "using such confidential information in the course of their jobs."

*Id.* ¶ 97. MERC asserts this is a breach of the employees' Employment Agreements, which was "intentionally induc[ed]" by Columbus, and a breach of the Teaming Agreement's non-solicitation provision. *Id.* ¶¶ 98–103.

Due to the termination of the Subcontract, MERC will lose an estimated $21 to 44.8 million in revenue from the remaining life of the contract, which puts MERC "in peril of going out of business." *Id.* ¶ 105–106. MERC also faces harms to its ability to obtain future government contracts and fulfill future contract obligations. *Id.* ¶ 107–115.

***Plaintiff's Claims***

MERC filed the instant lawsuit on September 3, 2026, asserting six counts: (1) breach of contract – nonsolicitation; (2) tortious interference with contracts – employee confidentiality agreements; (3) common law unfair competition; (4) breach of contract – scope of work; (5) fraudulent inducement; and (6) breach of contract – unlawful termination. *See* ECF 1. MERC filed a Motion for Temporary Restraining Order and Preliminary Injunction on September 18, 2026, seeking an order enjoining "Columbus, its employees and agents, and anyone else acting in concert with Columbus or at its direction" from:

1. Soliciting, before April 8, 2031, any other MERC employee staffed on the ESES IV contract to leave MERC's employment for Columbus, or any third party directed by Columbus;
2. Continuing to employ any former MERC employee that Columbus solicited, including any MERC employee previously staffed on the ESES IV project; and
3. Continuing to employ any former MERC employee on any NASA work or project.

ECF 10 at 3.

## II. LEGAL STANDARD

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer

irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, No. 9:19-CV-01369, 2019 WL 4942102, at *1 (D.S.C. Oct. 8, 2019). The movant must establish all four elements to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, No. CV 18-2315, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.* (alteration in original) (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)).

## III. DISCUSSION

MERC seeks a preliminary injunction preventing Columbus from soliciting any MERC employees staffed on the ESES Project, from continuing to employ any former MERC employees previously staffed on the ESES Project, and from continuing to employ any former MERC employee on any NASA work or project. ECF 10-1. In order to receive the relief requested, MERC must satisfy the four *Winter* factors. The Court will address each factor in turn, along with other arguments made by the parties.

**a. Issue Preclusion, *Rooker-Feldman*, and Full Faith and Credit**

As an initial matter, Columbus argues that MERC's attempt to get injunctive relief from this Court is an "[i]mpermissible [s]econd [a]ttempt" under principles of issue preclusion, the *Rooker-Feldman* doctrine, and the Full Faith and Credit Act. ECF 15-1 at 11–12. On June 29, 2026, MERC filed a complaint in the Circuit Court for Prince George's County, Maryland alleging largely the same facts as here. *See* ECF 15-3. The causes of action in the state court complaint are: (1) breach of contract based on Columbus's termination of the Subcontract; (2) breach of contract in regard to the scope of work; (3) fraud and misrepresentation stemming from Columbus's reclassification of MERC employees; and (4) tortious interference with MERC employees' non-solicitation and non-compete agreements. *See id.*

MERC moved for a preliminary injunction and TRO alongside the state complaint seeking an order "barring Columbus—or anyone at its direction—from soliciting or hiring MERC's employees." ECF 15-4 at 2. The Maryland court denied the motion, finding insufficient evidence of immediate and irreparable injury, insufficient evidence that Columbus breached the Subcontract, and that injunctive relief was improper because MERC alleged financial harms that could be remedied by damages. ECF 15-5 at 4. MERC then voluntarily dismissed its state complaint. ECF 17 at 3.

None of Columbus's arguments on this front succeed. As for issue preclusion and the Full Faith and Credit Act,[1] Maryland requires (1) the *issue* decided in the prior adjudication was identical with the one presented in the action in question, (2) there was a final judgment on the merits, (3) the party against whom the plea is asserted is a party or in privity with a party

[1] "The Full Faith and Credit Act, 28 U.S.C. § 1738, originally enacted in 1790, ch. 11, 1 Stat. 122, requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quoting *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986)). Accordingly, the same analysis applies to the issue preclusion and Full Faith and Credit Act arguments.

to the prior adjudication, and (4) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue. *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 761 A.2d 899, 909 (Md. 2000). First, the issues presented are not "identical." In this suit and for purposes of the instant motion, MERC alleges breach of contract based on the non-solicitation provision, ECF 10-2 at 7–14, but in the state court suit, it alleged breach based on termination of the Subcontract and the scope of work, ECF 15-3 at 5–6. Second, "the granting or denial of a preliminary injunction is not a final judgment on the merits," and therefore should not be given a preclusive effect. *Head v. Rakowski*, 695 F. Supp. 3d 663, 679 (D. Md. 2023) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395–96 (1981)). Accordingly, the state court's denial of MERC's first motion for preliminary injunction has no preclusive effect here.

As for *Rooker-Feldman*, the doctrine applies when "state-court losers complain[] of injuries caused by state-court judgments rendered before the [federal] district court proceedings commenced and invit[e] district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. Further, the doctrine only applies "when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 713 (4th Cir. 2006). Because MERC is not filing suit seeking review of the Maryland state court judgment or seeking redress from the state court's denial of its preliminary injunction, the *Rooker-Feldman* doctrine does not bar this subsequent suit.

**b. Likelihood of Success on the Merits**

Moving to the first *Winter* factor, "[t]o obtain preliminary injunctive relief, Plaintiffs bear the burden to show that they are likely to succeed on one of their claims." *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020). MERC argues that it is likely to succeed on two of its claims: (1) breach of the non-solicitation agreement (Count I), and (2) tortious interference with employee confidentiality agreements (Count II). ECF 10 at 2.

**i. Breach of Non-Solicitation Agreement (Count I)**

The parties do not dispute that between June 22, 2026, and July 2, 2026, Columbus hired 13 former MERC employees; four MERC employees were hired by third-party contractors also working on the ESES Project and under Columbus's control. ECF 10-2 at 5–7. MERC alleges that this is a violation of the Teaming Agreement's non-solicitation provision, which provides that during the "period of performance of any resultant prime contract or subcontract, ... and for one (1) year thereafter, the parties agree that neither shall directly or indirectly solicit for employment or otherwise seek to induce to leave the employ of the other party any technical or professional employees of the other assigned to work on the proposal effort or any resulting Prime contract or Subcontract." ECF 1-1 at 9. While the Subcontract does not address non-solicitation, and the Teaming Agreement expired at the execution of the Subcontract, MERC contends that the non-solicitation provision survived and Columbus violated it by soliciting MERC employees. ECF 10-2 at 7–14.

MERC advances two main arguments as to why it is likely to succeed on the merits of this claim: First, the Subcontract is only a partially integrated contract and so the non-solicitation provision was not discharged by the Subcontract. *Id.* at 9. Second, even if the Subcontract is fully integrated, non-solicitation does not fall within the Subcontract's scope, so the Subcontract would not have discharged the non-solicitation agreement. *Id.* at 11.

Columbus argues that Plaintiff cannot succeed in showing breach of contract because the non-solicitation clause is unenforceable. ECF 15-1 at 18. It contends that the Subcontract's merger clause entirely extinguished the Teaming Agreement's obligations, including the non-solicitation agreement. *Id.* The Subcontract's merger clause provides:

> The parties hereby agree that this is the entire agreement between the Buyer and Seller for the referenced Subcontract listed above; it supersedes and replaces all previous understandings, commitments, or agreements, oral or written, and shall not be varied or amended other than by written agreements executed by both parties.

ECF 1-3 at 1.

The parties agree that Maryland law governs the issue. *See* ECF 10-2 at 18; ECF 15-1 at 18. "Maryland law generally recognizes the validity and effect of integration clauses." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 985–86 (Md. 2011). Merger clauses "offer compelling evidence that the parties intended 'to finalize their complete understanding in the written contract and hence that there was no other prior or contemporaneous agreement not included in the written contract.'" *Baker DC, LLC v. Baggette Constr., Inc.*, 378 F. Supp. 3d 399, 408 (D. Md. 2019) (quoting *Pumphrey v. Kehoe*, 276 A.2d 194, 199 (Md. 1971)). That said, "[u]nder Maryland law, the presence of an express integration clause does not automatically resolve the parties' actual intention regarding integration." *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84, 88 (4th Cir. 2012).

A "writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.'" *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1024–25 (4th Cir. 1997) (quoting Restatement (Second) of Contracts § 210 cmt. b (1981)). "[F]ederal courts applying Maryland law have found it appropriate to look to '[t]he circumstances of the instruments' drafting and the content of the written instruments' for indications that the parties either did or did not intent to enact a fully integrated agreement." *Baker DC, LLC v. Baggette Constr., Inc.*, 378 F. Supp. 3d 399, 409 (D. Md. 2019) (quoting *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F.Supp.2d 640, 648 (D. Md. 2010), *aff'd*, 477 F. App'x 84 (4th Cir. 2012)). These factors include "the length of the written agreement, the extent of its detail, and the amount of time the parties spent negotiating the deal." *Id.* at 409 (citing *ARB (Am. Rsch. Bureau), Inc. v. E-Systems, Inc.*, 663 F.2d 189, 199 (D.C. Cir. 1980)).

As an initial matter, the preliminary record before the Court lacks detail regarding the circumstances of the Subcontract's drafting. Negotiation occurred for about two-and-a-half months, ECF 1 ¶ 25, and MERC alleges some details about the negotiations regarding labor classifications and wrap rates, *id.* ¶ 31, but makes no mention of negotiations or discussions regarding non-solicitation. MERC contends that it would be "commercially absurd for MERC to insist on non-solicitation requirements at the outset of the teaming relationship, only to abandon that commercially valuable right once … Columbus won the prime contract." ECF 10-2 at 13. However, in the absence of any factual allegations offered by MERC regarding the negotiation process, this Court cannot find that MERC has carried its burden to warrant the preliminary relief requested here.

Further, other factors present in the record suggest that the parties reasonably understood the Subcontract would supersede any prior negotiations or agreements, other than those expressly incorporated by reference. The Teaming Agreement is a 13-page document with a 1-page modification. *See* ECF 1-1; ECF 1-2. The non-solicitation provision was set to last "[d]uring the term of this Agreement and throughout the period of performance of any resultant prime contract or subcontract, including extensions or modifications thereto, and for one (1) year thereafter." ECF 1-1 at 9. However, by its own terms, "[e]xcept as it relates to proprietary or confidential information," the Teaming Agreement terminated upon "[e]xecution of a subcontract as contemplated in this Agreement." ECF 1-1 at 3–4.

The Subcontract is 86 pages. *See* ECF 1-3. Along with its integration clause on the first page, *id.* at 1, the Subcontract incorporates by reference 21 documents (none of which are the Teaming Agreement) and states that "[t]hese items constitute the entire agreement between the parties and shall supersede any previous agreements, written or oral, if any," *id.* at 2. Further, unlike the non-solicitation clause, the proprietary or confidentiality provisions that the Teaming

Agreement attempted to preserve appear again in the Subcontract independently. *See* ECF 1-3 at 26–27.

The completeness and thoroughness of the Subcontract compared to the Teaming Agreement, along with the express merger clause, "suggest the parties reasonably understood the [Subcontract] would supersede any prior negotiations or agreements (other than those expressly incorporated by reference)." *Baker DC*, 378 F. Supp. 3d at 409. While the Teaming Agreement may have contemplated a long-running non-solicitation agreement, the failure to include that provision in the Subcontract is likely fatal to MERC's arguments in the absence of any facts regarding the parties' negotiations which would rebut that assumption.

MERC's second argument—that even if the Subcontract is fully integrated, the non-solicitation provision is still enforceable because it falls outside of the Subcontract's scope—also fails. MERC relies on *Jaguar Land Rover North America LLC v. Manhattan Imported Cars Inc.*, 738 F. Supp. 2d 640, 648 (D. Md. 2010), *aff'd* 477 Fed. Appx. 84 (4th Cir. 2012) for the proposition that the "Subcontract's integration clause is simply untrue from the contract's face, because it is contradicted by the parties' expressed intent in the very next sentence." ECF 10-2 at 10. Columbus aptly argued that the present case is "meaningfully different." ECF 15-1 at 20. In *Jaguar Land Rover*, the defendant was presented with three different agreements to sign at once, each containing an integration clause, and the defendant argued that the final agreement signed superseded the first two agreements because of its integration clause. *Jaguar Land Rover*, 738 F. Supp. 2d at 644–45, 648. The court found that the integration clause did not supersede the other contracts, based on the "totality of the circumstances" which are different that those present here. *Id.* at 648–49. Namely, *Jaguar Land Rover*'s three agreements were tendered together in an "agreement package," each agreement alone was "insufficient to explain the full extent of the parties' obligations," and the agreements referenced attachments contained within each other. *Id.*

Here, the circumstances are sufficiently different: there was a two-year-gap between the Teaming Agreement's last modification and the signing of the Subcontract, the Subcontract is a comprehensive document which explains the full extent of the parties' obligations relating to the ESES Project, *see* ECF 1-3, and the Subcontract references an enumerated list of documents incorporated (which does not include the Teaming Agreement), *id.* at 2.

Accordingly, the scope of the Subcontract covers the parties' entire relationship and obligations to each other regarding the ESES Project, including non-solicitation. Therefore, MERC is unlikely to succeed on its claim that Columbus breached the non-solicitation provision and is not entitled to preliminary injunctive relief based on this claim.

**ii. Tortious Interference with Employee Confidentiality Agreements (Count II)**

MERC also seeks preliminary injunctive relief on its tortious interference claim. In their Employment Agreements, each of MERC's employees signed a confidentiality agreement, which provided that "any information a signatory (i) learns about NASA business, MERC's business, or the Subcontract, (ii) while working at MERC, and which (iii) is not public domain information or 'typical of industry practice,' is confidential indefinitely, i.e., until it becomes widely known." ECF 10-2 at 15. Columbus was made aware of the confidentiality agreements in March and April of 2026. ECF 1 ¶ 102. MERC alleges that its former employees are in breach of these agreements by "performing the same tasks and roles" for Columbus (or third-party subcontractors) that "they were performing while employed at MERC." *Id.* ¶ 96. Further, MERC alleges that "Columbus intentionally induced [the employees] to breach their confidentiality agreements by recruiting and hiring them to work on the ESES IV project," *id.* ¶ 131, and by using "coercive methods," such as threatening the employees that they will be "blackballed from current and/or future NASA work," *id.* ¶ 133.

To prove a claim of tortious interference under Maryland law, a plaintiff must establish "(1) the existence of a contract between the plaintiff and a third party; (2) the defendant's

knowledge of that contract; (3) the defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages to the plaintiff." *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 517 (D. Md. 2023) (citing *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. 1991)).

Columbus argues that MERC is unlikely to succeed on this claim because it cannot satisfy at least two elements: (1) MERC "has not proffered evidence (and cannot) that an employee has used or disclosed confidential information in violation of the alleged agreement," and (2) MERC "has not offered evidence (and cannot) that Columbus encouraged, required, or forced any employee to disclose protected information." ECF 15-1 at 23. Additionally, at oral argument and in its Motion to Dismiss, Columbus argued that the Employment Agreements are unenforceable under Alabama law. ECF 13-1 at 21–22.

Based on the preliminary factual record before the Court, MERC has not met its burden to show likelihood of success on the merits for its tortious interference claim. In support of this claim, MERC provides declarations by Terri Miller, the President and CEO of MERC, ECF 10-30, and David W. Miller, the Chief Operating Officer and Vice President of MERC, ECF 10-31. In these declarations, the Millers provide second-hand descriptions of how MERC's employees were contacted and solicited for employment by Columbus and other third-party companies. ECF 10-30 ¶¶ 27, 35–36, 39–40; ECF 10-31 ¶¶ 9–26. No declarations are provided from any of the impacted employees regarding their solicitation.

The record also contains no specific facts regarding MERC's allegations that the former employees are using and disclosing confidential information that they learned while employed by MERC in their course of their new employment with Columbus and third parties. Rather, MERC relies on an "inevitable disclosure" theory that "[b]y coming to work for Columbus on the ESES IV Project, the Former Employees are inevitably disclosing 'confidential

information' (as defined in their agreements) to other Columbus employees or agents." ECF 10-2 at 16.

This bare factual record does not allow the Court to draw the inferences that MERC asks it to at this stage in the litigation in order to find a likelihood of success on the merits. The Court has no facts on which to base its assumption that former MERC employees are using confidential information gained in the course of their MERC employment. And as Columbus points out, the former employees are "long term NASA contractors who have worked on previous ESES contract iterations" and "have transitioned between different federal contractors (both prime and subcontractors)," ECF 15-1 at 24, so the information that they are now using in the course of their employment is not necessarily sourced from MERC. Further, "the Maryland Court of Appeals has denounced the issuance of injunctions under the 'inevitable disclosure' theory." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 137 (D. Md. 2020) (citing *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 472 (Md. 2004)). Therefore, absent any specific factual allegations or evidence that employees were using or disclosing confidential information learned in the course of their MERC employment specifically, MERC has not met its burden at this stage.

Further weakening MERC's argument that it is likely to succeed on this claim, as Columbus argues in its Motion to Dismiss, is the possibility that the confidentiality provisions in the Employment Agreements are unenforceable. ECF 13-1 at 21–22. The parties agree that Alabama law governs the Employment Agreements. *Id.* at 21; ECF 19 at 14; *see* ECF 10-6 at 4. Alabama law permits restraints on trade only to the extent that they "preserve a protectable interest," Ala. Code § 8-1-190(b), which, in the case of "confidential information" is defined as:

> pricing information and methodology; compensation; customer lists; customer data and information; mailing lists; prospective customer information; financial and investment information; management and marketing plans; business strategy, technique, and methodology; business models and data; processes and

> procedures; and company provided files, software, code, reports, documents, manuals, and forms used in the business that may not otherwise qualify as a trade secret but which are treated as confidential to the business entity, in whatever medium provided or preserved, such as in writing or stored electronically.

*Id.* § 8-1-191(a)(2). Contracts that do not preserve a "protectable interest" and "by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section" are "void." *Id.* Columbus argues that, to the extent that MERC attempts to render confidential "information that belongs to NASA," MERC does not have a protectable interest, and the confidentiality provision is "overbroad and unenforceable." ECF 13-1 at 21.

MERC argues that Alabama law "explicitly exempts an employer's confidential information from being classified as a 'restraint of trade' under § 8-1-190." ECF 19 at 14. It cites to *Align Insurance Group, LLC v. Taylor*, which held that an employer's contractual provision barring an employee's disclosure of confidential information was enforceable under § 8-1-190(b)(4). No. CV 23-00006, 2023 WL 8351504, at *6–7 (S.D. Ala. Sept. 30, 2023). However, in *Align Insurance Group*, the confidentiality provision only applied to "confidential or proprietary information of or relating to the Company Group" and explicitly exempted information "obtained by Employee from a third party who is not subject to any confidentiality or fiduciary obligations with respect to such information." *Id.* at *2. MERC's confidentiality agreement is much broader than that and attempts to sweep in any information "about NASA business." ECF 10-2 at 15. While it is not clear from the limited factual record if such general facts "about NASA business" are the basis for MERC's claims, MERC has not met its burden at this stage to demonstrate that its former employees are disclosing information protectable under Alabama law. Accordingly, MERC has not demonstrated a likelihood of success on the merits of its tortious interference claim.

**c. Irreparable Harm**

To be entitled to injunctive relief, MERC must also make a "clear showing" that, without an injunction, it will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). Irreparable harm must be harm that "cannot be adequately satisfied with a monetary award, or accurately calculated, or that involves other rare and exceptional circumstances that justify the extraordinary relief of an injunction." *Barnett v. Young*, No. 5:18-CV-00279, 2018 WL 3405415, at *2 (S.D. W. Va. June 21, 2018) (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)). "The possibility that adequate compensatory or other corrective relief will be available at a later date … weighs heavily against a claim of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 (1974)).

MERC argues that the loss of its former employees irreparably injures it in the following ways: (1) absent injunctive relief, MERC will become insolvent before damages can be awarded; (2) MERC will lose goodwill with NASA in regard to the ESES Project and future projects; (3) at least some damages, particularly those due to inability to bid on other federal contracts, will be difficult to quantify; (4) MERC will be unable to replace its employees who have specialized NASA-specific knowledge, skills, and credentials; and (5) further confidential information is at risk of exposure. ECF 10-2 at 23–27.

Columbus argues, first, that MERC suffered no injury because it is not likely to succeed on the merits. ECF 15-1 at 29. In the alternative, Columbus argues that any harm was not "irreparable" because MERC has requested monetary relief for its claims and calculated that amount to be "at least $10.5 million." *Id.* at 29 (quoting ECF 1 ¶ 180).

Courts have "recognized that the loss of goodwill in the relevant industry, loss of customers, and loss of the ability to attract new customers are difficult to quantify in terms of money damages and thus may justify injunctive relief." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 436 (D. Md. 2024) (citing *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011)) (finding irreparable injury based on future loss of goodwill and loss of trade secrets after defendant solicited plaintiff's employees). Further, courts frequently grant injunctions when there is a substantial risk of disclosure of trade secrets or confidential information in the absence of court action. *See Hampton Roads Connector Partners v. Land to Sand Site Servs., Inc.*, No. 2:23CV174, 2023 WL 8539536, at *10 (E.D. Va. Oct. 17, 2023)

Therefore, the harm alleged is of the kind of irreparable harm that could warrant injunctive relief. This Court concludes that MERC has met its burden as to this factor.

**d. Balance of Equities and Public Interest**

To be entitled to a preliminary injunction, MERC must finally demonstrate that the balance of equities and public interest weighs in their favor. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Courts continually recognize that the public interest in a free market is not protected unless the legal system "prevent[s] unethical business behavior" and stops market participants from driving "another competitor out of business by unfairly misappropriating trade secrets" and other confidential business information. *See Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, No. 1:15-CV-858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015) (citations omitted).

However, here, the equities and public interest do not weigh in favor of MERC. While MERC argues that it seeks an injunction that "restores the status quo ante," ECF 10-2 at 28, the "status quo" that MERC seeks to return to is the week-long period in the summer of 2026 after the termination of the Subcontract, but before its employees were hired by Columbus.

Now, those employees have been working with Columbus for over three months, and the relief MERC seeks would require the Court to order their firing, or alternatively, to order that Columbus cannot staff them on any NASA projects, which is where the employee' specialized training and expertise lies. As previously noted, injunctions that would "alter rather than preserve the status quo," like MERC requests, are particularly disfavored. *Mountain Valley Pipeline*, 915 F.3d at 216 n.8. Further, the requested relief does little to rectify MERC's alleged harms because there is no guarantee that any of the employees would return to MERC or that MERC could staff them on the ESES Project since its Subcontract has been terminated. Instead, the requested relief would harm seventeen employees who are not parties to this suit. Additionally, NASA, and its ability to complete the ESES Project, would be harmed in the absence of these specialized employees' work. These two factors, then, weigh against MERC.

## IV. CONCLUSION

For the reasons stated above, MERC has not met its burden as to three of the four *Winter* factors and its Motion for Temporary Restraining Order and Preliminary Injunction, ECF 10, will be DENIED. A separate Order follows.

Dated: October 28, 2026

/s/
Stephanie A. Gallagher
United States District Judge